**Tremein HOSKINS, Defendant Below–Appellant,**

v.

**STATE of Delaware, Plaintiff Below–Appellee.**

**No. 98, 2010.**

Supreme Court of Delaware.

Submitted: Jan. 12, 2011.

Decided: Feb. 22, 2011.

Alexander W. Funk, Esquire, of Hudson, Jones, Jaywork & Fisher, Dover, Delaware, for the Appellant.

John Williams, Esquire, of the Department of Justice, Dover, Delaware, for the Appellee.

Before HOLLAND, JACOBS, and RIDGELY, Justices.

RIDGELY, Justice:

Defendant–Below/Appellant, Tremein Hoskins, appeals from his Superior Court

jury convictions of murder second degree, three counts of reckless endangering first degree, and four counts of possession of a firearm during the commission of a felony ("PFDCF"). Hoskins raises three arguments on appeal. First, Hoskins contends that the trial judge committed plain error in failing to instruct the jury specifically on how it should evaluate the credibility of the testimony of his alleged accomplice. Second, Hoskins contends that the trial judge committed plain error by failing to instruct the jury that it must agree unanimously upon the particular act or acts of criminality. Third, Hoskins contends that the trial judge committed plain error in admitting a witness's prior out-of-court statements pursuant to title 11, section 3507 of the Delaware Code.

We find no merit to Hoskins' appeal. Because defense counsel did not request an accomplice credibility jury instruction, the trial judge was not required to give that instruction *sua sponte*. For that reason, and also because defense counsel did not request a single theory unanimity jury instruction and the facts of this case did not warrant one, there was no plain error. Finally, Hoskins has not shown plain error in the admission of the section 3507 statements. Accordingly, we affirm.

### Facts [1]

Late one September evening, fifteen to twenty people were socializing outside of a community known as Capital Green in Dover. The group was "just standing out there talking, having fun." Music could be heard playing from one of their cars. The group included Brandon Beard, Leia Tolson, Jermaine Brown, Lentia Brown, Ashley Walton, and Lisa Moaney.

Meanwhile, less than two miles away in a residential area known as Capitol Park, another group of individuals was preparing to make the short trip to Capital Green. That group included Tremein Hoskins, Brett Hoskins, Darryl Copperhead, and Alonzo West.[2] Those four men got into West's burgundy Buick. West drove the car, Tremein Hoskins sat next to him in the front passenger seat, and Brett Hoskins and Copperhead sat in the back of the car. The group stopped at a nearby Royal Farms to get gas and continued on to Capital Green.[3]

Shortly thereafter, Leia Tolson observed at least two vehicles approach the crowd at Capital Green. First, a Jeep Cherokee drew near, and then a burgundy Buick "slowed down in front of [the crowd]" and "the person in the back seat rolled their window down." At that time, Tolson knew "something wasn't right," and that "some shots or something was going to get fired because of the way the cars [ ] came in at that time of night; you don't usually see cars come in like that." The cars parked one behind the other, not far from the crowd.[4] Then, Tolson "just heard gun-

1. The facts are taken from the testimony of the witnesses at each of Hoskins' two jury trials.

2. Although never confirmed, the two groups allegedly were involved in an ongoing dispute. The State alleged that the Capitol Park group was targeting Jermaine Brown on the night of the crime. In a statement to police, West explained that members of the Capital Green group assaulted Copperhead and that

the Capitol Park group may have been retaliating.

3. At Hoskins' trial, West testified that, during the stop at Royal Farms, Brett Hoskins exited the burgundy Buick with a gun and got into a Jeep Cherokee that also was traveling to Capital Green.

4. Tolson's testimony was not consistent entirely. She also testified that "[t]here was at least four cars out there."

shots" coming from "where the cars had parked at."[5] Although it is unclear how many shots were fired that night, Tolson heard "at least fifteen gunshots."[6] Tolson and the others then started to run to Lisa Moaney's nearby house.

Tolson looked back "to make sure that [they] didn't leave anybody outside." She saw Brandon Beard "on his knees; and he was holding his chest with one of his arms out." Tolson and a friend then carried Beard into Moaney's house and laid him on a couch. Beard "patted his chest" and informed his friends that he had been hit. Then, Tolson observed "the blood just [ ] coming through his sweats." Tolson called 911 from her cell phone. Beard stated, "I can't breathe." Beard then told his friends: "[c]all my mom" and "[d]on't leave me." Beard repeatedly stated: "I am going to die" and "[t]ake care of my kid." Shortly thereafter, paramedics arrived and transported Beard to nearby Kent General Hospital. Dr. Samuel Wilson, who was on call that night, received a page and reported to the hospital. Doctors began operating on Beard at approximately 2:00 a.m., but they were unable to save him. Beard was pronounced dead at 5:36 a.m. Doctor Judith Tobin identified the cause of death as "irreversible shock due to massive hemorrhage due to a gunshot wound to the left lung and the left subclavian vein." Tobin opined that Beard "had his back to where the bullet came from."

Later that day, Detective Robert Roswell interviewed Tremein Hoskins. First, Hoskins told Roswell that he was not at Capital Green when Beard was shot. Later in that interview, he recanted and admitted that he was at Capital Green, but stated that he did not see the shooting. During that interview with Tremein Hoskins, Roswell learned that Tremein and Brett Hoskins were in a burgundy Buick on the night of Beard's death and that a man named "Lonny" supposedly drove the car.

Two days later, Roswell and another detective drove to Capitol Park, where they believed "Lonny" resided. As they approached the entrance to the development, Roswell saw a burgundy Buick pulling out of the Capitol Park entrance. Roswell stopped the vehicle and its driver, Alonzo West. Roswell searched the vehicle, with West's consent, but found nothing related to the homicide. West arrived at a nearby police station approximately thirty minutes later and voluntarily discussed the events of the night in question. West stated that he was playing pool with friends earlier during the night of the shooting and that he had drank one beer. He also stated that he went to various liquor stores in Dover and then returned to Capitol Park. When asked who got into West's car later that night to go to Capital Green, West replied: "Well, Copperhead, as well call him, and me and Tre[mein]. And that is it."[7] West then admitted that he owned a Ruger 9mm,[8] but that neither

---

5. Tolson testified: "That wasn't just one gun. Yeah, it would have been more than one person shooting."

6. Lisa Moaney testified that she heard "six or seven" shots. Officer Jeffrey S. Welch, who was patrolling nearby, testified that he heard "a string of five, then a pause, then a string of four" shots.

7. Later in the interview, the detective stated: "They said—the guys, got out of the burgundy car, that were shooting. So, you need to be very clear on exactly who was with you." West replied: "It was Tre[mein], um, Copperhead."

8. West also stated that another man, "Boojie," had a gun that night and that "[i]t may have been a nine too."

he nor Copperhead exited the vehicle or fired a gun that night. But, West stated that Hoskins used his gun:

Detective: So, who did you let use your gun? Was it somebody in your car?

West: Hm, yeah.

Detective: Which one?

West: Ah, Tre[mein].

Detective: Ok, now afterwards, does he give it back to you?

West: Well, yeah.

Detective: All right. Does he get out and shoot, or does he shoot out the window, or what?

West: Hm, got out.[9]

\* \* \*

Detective: How many times you figure he shot?

West: Who?

Detective: Tre[mein].

West: Could only shoot five rounds.

At the end of the interview, Roswell obtained West's consent to retrieve the Ruger 9mm from West's girlfriend's trailer. Roswell found a blue gym bag, which contained a gun case. That gun case contained a Ruger 9 mm handgun. The Ruger 9mm contained a magazine, but no bullets. Roswell also found a receipt for the Ruger 9mm that identified West as its purchaser. The gym bag also contained, among other things, "a Wal–Mart bag with a box of .22–caliber bullets, a 50–count box, and all the bullets were in the box."

Roswell then interviewed Tremein Hoskins again. In that interview, Hoskins finally admitted that he fired West's gun on the night of Beard's death, but Hoskins did not describe the type of gun he fired.

In his previous interview, Hoskins had denied even observing the shooting. Hoskins explained his recantation as follows: "I didn't know what was going on yet. I didn't know what was what. I am not— that's something that I don't do all the time, so I wasn't involved in anything like that on any other occasion."

Back at the scene of the crime, police recovered twelve spent shell casings. Carl Rone of the Delaware State Police Forensic Firearms Service Unit determined that seven were fired from one gun and five were fired from another. When police recovered those spent shell casings, the group of five and the group of seven were approximately twelve to fifteen feet apart. Rone determined that all were fired from 9mm handguns. No .22 caliber casings were found. Rone analyzed test rounds fired from the Ruger 9mm that Roswell recovered from West's residence and determined that the bullet that killed Beard had been fired from that Ruger 9mm. Rone also determined that of the twelve shell casings that were recovered from the crime scene, five matched West's Ruger 9mm.[10]

There was additional forensic evidence, but it proved inconclusive. Corporal Marc Gray found one fingerprint on the magazine of West's Ruger 9mm. The fingerprint was on the middle of the magazine, so it likely resulted from that person either loading the magazine with bullets or loading the gun with the magazine. Police determined that the fingerprint did not match Tremein Hoskins' fingerprint.

Approximately one year after his first statement to police, West gave a second interview in connection with a plea. He stated: "[Hoskins] asked me yo can you go

9. Earlier in the interview, in contrast, West stated: "Listen. Like I said, I don't know if anybody got out, if Doobie got out. I don't know."

10. Police never recovered the other 9mm handgun that was fired on the night of the crime.

get you um get you um get your gun. I got you this and that. He asked me about 3 or 4 times so." West confirmed that he drove the burgundy Buick that night and stated that "Tremein, Brett, and um Copperhead was in the car," but when they stopped at Royal Farms, "Brett got out the car and jumped [ ] in the Jeep."[11] West stated that he followed a Jeep into Capital Green and the following occurred:

[The Jeep] was like little bit behind me I mean I was like like here may been on the other side like little back in back or whatever and then me [ ] Trem[e]in and Copperhead were sittin in the car then um next thing we was talking next thing we heard uh was bop bop bop then Tremein jumped out the car he grabbed the gun, jumped out the car me and Copperhead stayed in the car and then when uh when I heard shots (unintelligible) you know what I mean (unintelligible).

West stated that the group then returned to Capitol Park, discussing what had just occurred. West recalled:

Yeah and um um Brett and um (unintelligible) about something and (unintelligible) said um about mentioned about um yeah I shot up in the air whatever something like that. Didn't nobody shoot up in the air. Then um Brett said um pointed to what 2 or 3 people you all see what I done right. You see what I done. You see what I done.[12]

### Procedural History

Tremein Hoskins was charged by indictment with murder first degree, attempted murder, conspiracy first degree, two counts of reckless endangering first degree, and four counts of PFDCF.[13] Hoskins' case proceeded to a jury trial. The jury could not reach a verdict on the murder first degree and conspiracy first degree charges. The jury found Hoskins not guilty of attempted murder, but guilty of the lesser-included offense of reckless endangering first degree. The jury also found Hoskins guilty of two counts of reckless endangering first degree and four counts of PFDCF.

After declaring a mistrial as to the murder first degree and conspiracy first degree counts, the Superior Court scheduled another jury trial. The State dropped the conspiracy count and proceeded on the lesser-included charge of murder second degree.

West testified at Hoskins' second trial. When asked why Hoskins exited the burgundy Buick, West explained: "It was a couple of shots. But then he had jumped out of the car. Grabbed the gun, and jumped out of the car." West also testified that, upon Hoskins' request, West brought his Ruger 9mm with him that night and that Hoskins grabbed it from under the armrest when exiting the car. West recalled that he heard "a couple more shots," and then Hoskins got back into the car "maybe two, three seconds after that." West testified that "[b]etween four and five" bullets were in the gun when Hoskins exited the car and that the gun was empty when Hoskins returned.

11. West stated that he could not recall if anyone spoke during the ride because he "was drinking a little bit" that night.

12. West also stated that between the time of his first and second statements, he saw Tremein in prison: West recalled: "He said well I sh I shot up in the air and that's all he said. You know he said maybe 2 3 times and well I shot up in the air. I ain't shoot at nobody. I I just shot up in the air."

13. West and Brett Hoskins also were charged by indictment with those same crimes. West pleaded guilty to murder second degree and conspiracy first degree. Brett Hoskins pleaded guilty to conspiracy first degree.

As for the blue gym bag that police recovered from West's home, West testified that everything in it belonged to him,[14] except the .22 caliber rounds.[15] Despite pleading guilty to conspiracy first degree, West testified that he did not conspire with anyone on the night of Beard's death. West was unable to explain inconsistencies that existed between his prior police statements and his testimony at trial.

Tremein Hoskins also testified at his second trial. He testified that he did not shoot Brandon Beard, and that he shot a .22 caliber revolver, not a Ruger 9mm. Hoskins stated that West had a .22 caliber revolver that night and that West handed that gun to him. Hoskins testified that the .22 caliber revolver was "black and silver—or chrome, black and chrome; either one of those" and that West had owned it for only a few months. But, Hoskins recalled that he had used the .22 caliber revolver to "shoot beer bottles and

things like that." Hoskins testified that he shot the .22 caliber revolver into the air on the night that Beard was killed to "[l]et them know I had a gun too, and just to scare somebody off." Lastly, Hoskins testified that West refers to the .22 caliber as a "walkie" because "it's unregistered, and he carries it with him."[16]

At the prayer conference, defense counsel did not request accomplice credibility or single theory unanimity jury instructions.[17] But, the State requested a general accomplice liability instruction, which the trial judge gave.[18] The jury found Hoskins guilty of murder second degree, and for that conviction, the trial judge sentenced him to forty years at Level V, with a mandatory prison term of fifteen years. This appeal followed.

### Analysis

■■ Hoskins raises three arguments on appeal, none of which defense counsel

14. The blue gym bag contained, among other things, the Ruger 9mm, a receipt for that gun with West's name on it, prescription bottles with West's name on it, bills addressed to West, and a cell phone charger.

15. When asked why the .22 caliber rounds were in his bag, West explained: "Like I told you, somebody had left them in my car—left them in my car when I went in my house. I checked my car and stuff, and I seen the bag in the back. I opened it up; I seen there was 22 shells in it. So [one or two months before Beard's death], I took the shells inside the house instead of leaving them in the car. I put them in the bag. So if I ran into them, I would ask them: Yo, you left your things. I would have gave them back to him." When asked why he put someone else's .22 caliber rounds in a bag that contained all of his own personal items, West explained: "The reason I put them in the bag was because there was a little child in the house. So, I put them in a bag where it would be safe at where he couldn't get to them."

16. Police never recovered the .22 caliber revolver that Hoskins described.

17. Defense counsel also did not request those jury instructions at Hoskins' first jury trial. When asked why defense counsel did not request an accomplice credibility jury instruction, appellate counsel, who was also defense counsel, stated at oral argument: "It was not requested.... It was a matter of oversight.... Looking back on it, it should have been done, but it's a matter of oversight."

18. The trial judge also gave a general instruction on the credibility of witnesses as follows: "You are the sole judge of the credibility of each witness including the defendant and of the weight to be given to the testimony of each. You should take into consideration each witness' means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of his/her testimony; the consistency or inconsistency of his/her testimony; the motives actuating him/her; the fact, if it is a fact, that his/her testimony has been contradicted; his/her bias, prejudice, or interest, if any; his/her manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the credibility of his/her testimony."

raised below. Consequently, we review each of Hoskins' three claims for plain error.[19] "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[20] "Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[21]

### A trial judge must give an accomplice credibility instruction upon request

■ Hoskins argues that the trial judge committed plain error in failing to give a specific jury instruction on the credibility of accomplice testimony. In *Bland v. State*,[22] this Court considered an appeal where a jury convicted two co-defendants of a crime based solely on the uncorroborated testimony of two supposed accomplices.[23] The *Bland* court reversed the convictions on the ground that the State presented insufficient evidence of the [crime(s)].[24] But, the *Bland* court also suggested that courts should give a specific jury instruction when the credibility of

an accomplice is a material issue in a case,[25] and recommended the following instruction:

A portion of the evidence presented by the State is the testimony of admitted participants in the crime with which these defendants are charged. For obvious reasons, the testimony of an alleged accomplice should be examined by you with suspicion and great caution. This rule becomes particularly important when there is nothing in the evidence, direct or circumstantial, to corroborate the alleged accomplices' accusation that these defendants participated in the crime. Without such corroboration, you should not find the defendants guilty unless, after careful examination of the alleged accomplices' testimony, you are satisfied beyond a reasonable doubt that it is true and that you may safely rely upon it. Of course, if you are so satisfied, you would be justified in relying upon it, despite the lack of corroboration, and in finding the defendants guilty.[26]

Forty years after *Bland,* this Court, in *Smith v. State,*[27] granted a defendant's motion for postconviction relief because his counsel failed to request a *Bland*-type of instruction.[28] In evaluating the prejudice prong of the postconviction movant's

19. *See* Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented."); *Turner v. State,* 5 A.3d 612, 615 (Del.2010) (quoting *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986)).

20. *Turner,* 5 A.3d at 615 (quoting *Wainwright,* 504 A.2d at 1100).

21. *Id.*

22. 263 A.2d 286 (Del.1970).

23. *Id.* at 288.

24. *Id.* at 289.

25. *Id.*

26. *Id.* at 289–90.

27. 991 A.2d 1169 (Del.2010).

28. This Court also has encountered the issue of accomplice credibility instructions in other cases, but those cases examined whether the precise content of the instructions were adequate. *See Cabrera v. State,* 747 A.2d 543 (Del.2000); *Bordley v. State,* 832 A.2d 1250, 2003 WL 22227558 (Del.2003) (TABLE).

*Strickland v. Washington* claim,[29] we explained:

When a defendant is tied to a crime through the testimony of an accomplice-witness, specific accomplice credibility instructions are required. However, trial counsel's failure to request such an instruction will not always be prejudicial *per se*. The prejudicial effect depends upon the facts and circumstances of each particular case.[30]

◼ Hoskins claims that the first sentence of the preceding quote created a new rule that retroactively applies to his case. Consequently, (Hoskins argues) the trial judge committed plain error in failing to give *sua sponte* an accomplice credibility instruction at his trial. But, *Smith* did not create such a broad rule. The quotation above must be read with due regard for the procedural posture of *Smith.* There, the defendant moved for postconviction relief on the ground that his counsel was ineffective for failing to request a *Bland*-type of instruction. The *Smith* court held that a trial judge is required to give a *Bland*-type of instruction, *upon request,* when accomplice testimony is presented. The *Smith* court further held that defense counsel's failure to request a *Bland*-type of instruction will not constitute prejudice *per*

*se* under *Strickland v. Washington*.[31] Rather, "[t]he prejudicial effect depends upon the facts and circumstances of each particular case."[32] Consequently, *Smith* does not apply here, and we must deny Hoskins relief on this claim.[33]

### *Defense counsel did not request, and the circumstances did not warrant, a single theory unanimity jury instruction and, therefore, Hoskins was not entitled to that instruction*

◼ Hoskins next argues that the trial judge committed plain error by failing to give a single theory unanimity jury instruction. In *Probst v. State*,[34] this Court explained that a general unanimity instruction typically suffices to insure that the jury is unanimous on the factual basis for a conviction. But, the *Probst* court recognized that the general rule does not apply "where there are factors in a case which create the potential that the jury will be confused."[35] The *Probst* court then stated that a more specific jury instruction—a single theory unanimity instruction—is required if the case presents the following three circumstances: (1) "[the] jury is instructed that the commission of any one of several alternative actions would subject the defendant to criminal liability," (2) "the

29. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

30. *Smith,* 991 A.2d at 1180 (citation omitted).

31. 466 U.S. at 691–96, 104 S.Ct. 2052 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

32. *See Smith,* 991 A.2d at 1180 (citation omitted).

33. Although we conclude that the trial judge did not commit plain error in not giving an accomplice credibility jury instruction because defense counsel did not request it, Hos-

kins is not precluded from raising an ineffective assistance of counsel claim in a timely filed Rule 61 motion for postconviction relief. In the event he does, a complete record can be developed on (1) whether defense counsel's conduct fell within the wide range of reasonable professional assistance, and (2) if not, whether there is a reasonable probability that, but for defense counsel's alleged unprofessional errors, the result of the trial would have been different. *Cf. Sahin v. State,* 7 A.3d 450, 454 (Del.2010). This opinion does not address either of those Rule 61 inquiries.

34. 547 A.2d 114 (Del.1988).

35. *Id.* at 120 (citing *United States v. Beros,* 833 F.2d 455, 460 (3d Cir.1987)).

actions are conceptually different," and (3) "the State has presented evidence on each of the alternatives." [36]

This Court has applied the *Probst* framework in several cases. Because a *Probst* analysis turns on the specific facts of each case, it is necessary to examine each case's specific facts. First, in *Probst* itself, the Court explained that a single theory unanimity instruction would be required if the State sought to retry the defendant.[37] In that case, it was undisputed that the victim was shot,[38] but there was conflicting and confusing testimony regarding who shot him.[39] The defendant testified that she fired her shotgun into the air to frighten the victim and that her accomplice fired his shotgun in the direction of the victim.[40] The accomplice testified that he shot twice in the victim's direction, but towards the ground in front of the victim.[41] The accomplice's son testified that he saw the defendant fire her shotgun into the field and that his father fired "twice into the weeds." [42] The State submitted its case to the jury under the theory that the defendant was guilty of shooting the victim or that she was guilty of shooting the victim as a result of encouraging her accomplice to fire.[43] On a Motion for Rehearing *En Banc*, the *Probst* court explained that a single theory unanimity theory jury instruction was "desir-

able" because there was one charge and "evidence of two separate incidents ([the defendant's] shots and [the accomplice's shots]) to support a conviction on alternate theories of liability." [44] The *Probst* court carefully explained the narrow applicability of its test:

> [T]his Court does not hold that a specific unanimity instruction is required in every case where a defendant may be convicted as a principal or as an accomplice. In fact, this Court recognizes that even when principal and accomplice liability theories are advanced, a general unanimity instruction is usually sufficient in the absence of a defense request for a specific instruction or in the absence of unusual circumstances creating a potential for confusion, e.g., alternative incidents which subject the defendant to criminal liability.[45]

In *Liu v. State*,[46] we applied the *Probst* analysis again. *Liu* involved two people and a single incident. The *Liu* court explained that in such a case, "a general unanimity instruction serves to prevent both persons from escaping criminal responsibility, where there is compelling evidence that they jointly planned and carried out the criminal enterprise." [47] The *Liu* court concluded that the trial court did not

---

**36.** *Id.* at 121 (quoting *State v. Edwards*, 10 Conn.App. 503, 524 A.2d 648, 653 (1987)).

**37.** *Id.* at 122.

**38.** *Id.* at 116.

**39.** *See id.* at 116–17.

**40.** *Id.* at 116.

**41.** *Id.*

**42.** *Id.* at 117. Two neighbors also heard the exchange of gunfire. One neighbor testified that he heard "three shotgun blasts followed by a short pause and then a mixture of shot-

gun blasts and small arms fire." *Id.* The other neighbor testified that he heard "a rapid series of shotgun blasts followed by a slower series of small arms fire." *Id.*

**43.** *Id.* at 120.

**44.** *Id.* at 124 (citing *Davis v. United States*, 448 A.2d 242, 243–44 (D.C.1982)).

**45.** *Id.* at 122 (citing *Shivers v. United States*, 533 A.2d 258, 261–63 (D.C.1987)).

**46.** 628 A.2d 1376 (Del.1993).

**47.** *Id.* at 1386.

commit plain error in failing to give a single theory unanimity instruction.[48]

In *Stevenson v. State*,[49] we also applied the *Probst* analysis. The *Stevenson* court explained that "unlike *Probst*, the fatal shooting of [the victim] involved a single individual with a single gun and not distinct contemporaneous actions by two individuals who were each firing weapons at the same victim."[50] The *Stevenson* court concluded that a single theory unanimity instruction was not required.[51]

In *Ayers v. State*,[52] this Court had yet another opportunity to apply the *Probst* analysis, which turned on the applicability of the second *Probst* circumstance. The *Ayers* court explained:

[The victim's] homicide involved a single individual with a single gun. Thus, it constituted a single incident. If the jury all agreed that [the accomplice] and [the defendant] were involved in a principal-accomplice relationship and that one of the two men shot [the victim], their verdict would be considered unanimous. The trial judge properly refused to require the jury to identify which man was the shooter and which was the accomplice.[53]

In cases with facts similar to *Liu*, *Stevenson*, and *Ayers*, this Court consistently has held that the trial judge did not err in failing to give a single theory unanimity instruction.[54]

Two of the three *Probst* circumstances are present in this case. The first circumstance is present because the trial judge instructed the jury on accomplice liability at the prosecutor's request. As for the third *Probst* circumstance, although the prosecutor argued that Hoskins was the principal actor, in closing argument the prosecutor also presented an alternative theory, as follows:

Let's think about now how, if you believe this newest and latest version of the events, how that changes things. It doesn't change anything, because there's something called accomplice liability. So if you don't think he was the shooter, it doesn't matter, because someone else in that group would have fired the murder weapon that killed Brandon Beard, and he would have been an accomplice to that. He was out there with all of them together.

Therefore, the third *Probst* circumstance is also present.

■ Consequently, the issue here is whether this case presents facts that prove the second *Probst* circumstance—whether "the actions are conceptually different" or "distinct."[55] We conclude that the second *Probst* circumstance was not present because the facts of this case do not present the kind of "conceptually different" or "distinct" actions involved in *Probst*.[56]

48. *Id.*

49. 709 A.2d 619 (Del.1998).

50. *Id.* at 634.

51. *Id.* at 634–35.

52. 844 A.2d 304 (Del.2004).

53. *Id.* at 309.

54. *See Soliman v. State*, 918 A.2d 339, 2007 WL 63359 (Del.2007) (TABLE); *Pierce v. State*, 911 A.2d 793 (Del.2006); *Hendricks v.*

*State*, 805 A.2d 902, 2002 WL 2030875 (Del. 2002) (TABLE); *Brown v. State*, 729 A.2d 259 (Del.1999); *Dixon v. State*, 673 A.2d 1220 (Del.1996); *Pope v. State*, 632 A.2d 73 (Del. 1993); *Bryant v. State*, 571 A.2d 786, 1990 WL 17775 (Del.1990) (TABLE); *Zimmerman v. State*, 565 A.2d 887 (Del.1989).

55. *See Probst*, 547 A.2d at 121 (quoting *Edwards*, 524 A.2d at 653).

56. *See id.*

Rather, the facts are more like those described in *Liu, Stevenson,* and *Ayers.* Although the shooting here involved multiple guns, police determined that one gun—West's Ruger 9mm—delivered the fatal shot. Unlike the "unusual facts and circumstances" of *Probst,*[57] this case turned on the identity of the person who fired the Ruger 9mm, not the identity of the shooter and the gun amid two separate incidents. Accordingly, there was no potential for jury confusion. "[A] general unanimity instruction is usually sufficient in the absence of a defense request for a specific instruction or in the absence of unusual circumstances creating a potential for confusion."[58] Because defense counsel did not request, and the circumstances did not warrant, a single theory unanimity jury instruction, Hoskins has not shown that he was entitled to that instruction or that the trial judge committed plain error by not giving it.

### *Hoskins has not shown that the trial judge committed plain error in admitting West's prior out-of-court statements pursuant to title 11, section 3507 of the Delaware Code*

■ Finally, Hoskins claims that the trial judge committed plain error in admitting West's prior out-of-court statements pursuant to title 11, section 3507 of the Delaware Code. Specifically, Hoskins argues that the State did not satisfy a foundational requirement of that section—that the declarant testify that the statements were truthful.

Title 11, section 3507(a) of the Delaware Code provides: "In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value." This Court has established certain foundational requirements for the admission of section 3507 statements: "[A] witness' statement may be introduced [under section 3507] only if the two-part foundation ... is first established: [by having] the witness testif[y] about both the events and whether or not they are true."[59]

At Hoskins' first trial, West testified as follows:

Q: Did you also agree at the time of your plea that the statements you gave to the police were truthful?

A: Yes.

At Hoskins' second trial, West similarly testified as follows:

Q: Did you also agree at [the time of your plea that] the statements you gave to the police were truthful, those two prior statements that you had given?

A: Yes.

Hoskins argues that the State failed to satisfy the "truthfulness" foundational requirement of section 3507 because "the State merely asked West if he had previously stated—at some undetermined time when he entered into his plea agreement, and not in front of the ultimate trier of fact, the jury in the Defendant's trial—that his out of court statements were truthful." Hoskins argues that to meet section 3507's foundational requirements, the State should have "ask[ed] West if the content of his out of court statements were truthful."

The meaning of the following two questions certainly differs: (1) "did you [ ] agree at the time of your plea that the statements you gave to the police were truthful?"; and (2) "were the statements

---

**57.** *See id.* at 124.

**58.** *Id.* at 122 (citing *Shivers,* 533 A.2d at 261–63).

**59.** *Woodlin v. State,* 3 A.3d 1084, 1087 (Del. 2010) (quoting *Ray v. State,* 587 A.2d 439, 443 (Del.1991)).

you gave to the police truthful?" But, the issue is whether that difference is so significant that it amounts to plain error. We have explained that technical noncompliance with section 3507's foundational requirements may not always amount to plain error.[60] Here, we cannot conclude that the prosecutor's question was so different from the preferred, technically correct inquiry as to be "clearly prejudicial to [Hoskins'] substantial rights [so] as to jeopardize the fairness and integrity of the trial process."[61] We recognize that the prosecutor's questions could have been phrased better. We also recognize that a different form of that question, such as, "is the content of the statement you gave true?," would have been preferable. But, under the circumstances in this case, Hoskins has not shown plain error.

### Conclusion

The judgments of the Superior Court are **AFFIRMED.**

---

**60.** *See Turner,* 5 A.3d at 616–17; *Jackson v. State,* 643 A.2d 1360, 1368–69 (Del.1994).

**61.** *See Turner,* 5 A.3d at 615 (quoting *Wainwright,* 504 A.2d at 1100).