## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WARREN A. BROOKS, | § | |
| | § | No. 217, 2014 |
| Defendant-Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below—Superior Court |
| | § | of the State of Delaware, |
| STATE OF DELAWARE, | § | in and for Kent County, Delaware |
| | § | C.A. No. 1305019721 |
| Plaintiff-Below, | § | |
| Appellee. | § | |

Submitted: February 18, 2015
Decided: February 24, 2015

Before **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices.

## O R D E R

This 24th day of February 2015, it appears to the Court that:

(1)     The defendant below-appellant, Warren A. Brooks, ("Brooks"), was indicted on one count of Possession of a Firearm or Firearm Ammunition by a Person Prohibited, one count of Possession of a Deadly Weapon (Firearm) by a Person Prohibited, one count of Carrying a Concealed Deadly Weapon, one count of Conspiracy Second Degree, and one count of Resisting Arrest. Prior to trial, it was stipulated by all parties that Brooks and his co-defendants were all prohibited from possessing firearms at the time of their arrest. The jury found Brooks guilty of all charges. The jury did not reach a unanimous verdict as to Brooks' co-defendants, Derrell Snipes ("Snipes") and Trevor Jenkins ("Jenkins"). Brooks was

sentenced to be incarcerated for ten years and nine months at Level V followed by probation.

(2)    Brooks raises four claims of error in this direct appeal. First, Brooks argues that the trial court denied his federal Constitutional rights to due process and to be free from double jeopardy when it denied his motion for a judgment of acquittal and sent the indictment to the jury without clarifying which alleged acts were being charged in each of the individual counts. Second, Brooks contends that the prosecutor's continued questioning and testimonial references to the police viewing an allegedly much clearer video at the police station then the DVD presented as evidence to the jury amounted to improper vouching. Third, Brooks submits that the prosecutor's improper statements at trial and during the State's closing were repetitive errors central to the State's case and cast doubt on the integrity of the judicial process. Finally, Brooks argues that, even if this Court were to conclude that each individual error, was harmless, the cumulative impact of the errors requires reversal. We have concluded that all of Brooks' claims are without merit. Therefore, the judgment of the Superior Court must be affirmed.

(3)    On the early morning of May 24, 2013, Dover Police Department Patrolman First Class (PFC) John Michael Willson was on patrol on South New Street, "a high-crime, high-drug area" in the City of Dover.[1] Around 2 a.m., PFC

---

[1] The facts are taken from the State's Answering Brief.

Willson observed a large, very animated group of 10 to 15 people in the vicinity of the Colonial Apartments at 132 South New Street. Two or three individuals were throwing their hands up in the air, and Willson saw one person being restrained by someone. Sensing there might be a potential problem, Willson reported the situation by radio to Sergeant David Spicer, his supervisor. Since Willson was alone, Spicer told Willson to return to the Dover Police station, pick up other officers, and formulate a plan.

(4) Pursuant to Spicer's order, Willson radioed five other Dover Police Officers on his shift (Master Corporal Brian Sherwood, PFC Joseph Bauer, and Patrolmen Krough, Wood, and Schmidt), and requested that they meet at the Dover Police station. Once assembled at the station dispatch center, Sergeant Spicer and the six Dover Police officers were able to observe the group of civilians assembled on South New Street by means of a remote surveillance camera located behind Kunkel's Auto Supply.

(5) The City of Dover has multiple cameras that allow the police to monitor activity on downtown streets. The Dover downtown surveillance cameras may be moved by a police dispatcher and there is a zoom feature for closer viewing of a particular location. At the Dover Police station, the images detected by the remote surveillance cameras may be viewed live on two 72" High

Definition screens in the-station dispatch area. In addition, the cameras have a recording system.

(6) At the Dover Police Station, one of the remote surveillance cameras was pointed directly at 132 South New Street at 2:22 a.m. on May 24, 2013. At that time it was raining. In the area of the Colonial Apartments, there was an alley between that South New Street location and South Queen Street. There was also a wrought iron gate and fence in the alley.

(7) The assembled Dover Police officers watched the activities at the 132 South New Street location on the Station's 72" screens. According to Sergeant Spicer, it appeared that the group on South New Street was about to fight. While watching the South New Street activity on the remote surveillance camera, the Dover Police officers observed Jenkins walk to a silver Malibu automobile parked on South New Street, retrieve an object from the driver's compartment, place the object in his right rear pocket, return, and jump over a fence in the alley.

(8) While still observing the remote surveillance camera broadcast at the station, the police officers then saw Brooks walk to the same silver car, open the car trunk, remove a long object covered with clothing (jeans) or cloth, and walk to the alleyway fence that Jenkins had previously jumped. At the alleyway, Brooks set the concealed object to the side of the fence where it was retrieved by Snipes.

4

(9)     Viewing this activity remotely at the station, the assembled police officers suspected that Jenkins and Brooks had both retrieved firearms from the silver car.  Spicer thought the long object covered with clothing that Brooks removed from the car trunk was a long gun (a rifle or shotgun).  Officer Sherwood also thought the concealed object Brooks obtained might be a "chopper," or sawed-off shotgun.

(10)    Sergeant Spicer believed that "something was about to happen," and he feared that "there was going to be a shooting."  Spicer ordered Willson and Sherwood to go to New Street and the other four officers (Krogh, Schmidt, Bauer, and Wood) to go to South Queen Street.

(11)    When Willson and Sherwood got to South New Street, they noticed that the unoccupied silver Malibu was running.  Willson thought that because the Malibu was running it could be a get-away vehicle.  Sherwood blocked in the Malibu with his police vehicle, and removed the keys from the Malibu ignition. The Malibu was later towed to the Dover Police station, and searched.

(12)    Officers Krogh and Wood went to South Queen Street where individuals on the front porch of 133 South Queen Street pointed down the alleyway where the large group was still gathered.  Krogh shined his flashlight down the alleyway at the group, and three of the individuals (Brooks, Jenkins, and Snipes) started running.  Krogh yelled, "Stop, police," but they continued fleeing.

5

Wood saw Snipes throw down the jeans containing the hard object that Brooks had taken from the car trunk.

(13) Officer Wood took Snipes into custody while Officer Bauer retrieved the jeans Snipes had just discarded. Inside the wet jeans, Bauer discovered a sawed-off shotgun loaded with two 12-gauge rounds. The shotgun Snipes discarded was admitted into evidence at the joint jury trial of all three defendants (Brooks, Jenkins and Snipes) as State's Exhibit # 4, and the two shotgun shells removed from that firearm were admitted as State's Exhibit # 5.

(14) Brooks was also apprehended at the scene when he jumped the alleyway fence and began running north on South New Street directly at Officers Sherwood and Willson. Both policemen drew their weapons and yelled "Police." Brooks was taken into custody when he slipped on the wet roadway and fell. At trial Sherwood confirmed that Brooks was the same person who removed the concealed shotgun from the car trunk and who slipped and fell on South New Street when he ran toward Sherwood and Willson.

(15) Once Willson gained control of Brooks, Sherwood joined Officer Krogh in pursuing Jenkins who ran toward Loockerman Street. Jenkins ran for a few blocks in downtown Dover, although he lost at least one of his shoes near Bradford Street during his attempted escape. Jenkins, the last fleeing suspect, was apprehended in the State Street alley after being Tazered by Sherwood.

6

(16) Officers Krogh and Schmidt handcuffed Jenkins, and Krogh discovered a Taurus .38 Special revolver loaded with five rounds in Jenkins' right rear pocket. Jenkins' revolver was admitted as State's Exhibit # 6, and the 5 bullets in the cylinder were State's Exhibit # 7. Jenkins later gave a recorded statement to Dover Detective Christopher Bumgarner wherein Jenkins admitted the revolver was his gun. Neither Brooks nor Snipes spoke with Bumgarner, the chief investigating officer.

(17) All three defendants were prohibited from possessing a firearm and a stipulation to that effect was entered at trial. None of the three defendants either testified at the joint trial or summoned any other defense witnesses.

(18) Brooks argues that his federal Constitutional due process and double jeopardy rights were violated because the Indictment failed to indentify "which alleged crimes occurred in each of the counts against the defendants." Brooks did not raise this claim about an alleged lack of specificity in his Indictment prior to trial and he did not request a Bill of Particulars.[2]

(19) Del. Super. Ct. Crim. R. 12(b)(2) requires that an objection based on defects in the indictment or information, other than lack of jurisdiction or failure to charge a crime, *must* be raised prior to trial.[3] The Superior Court did not address the specificity of the Indictment because Brooks never challenged the Indictment

---

[2] *See* Del. Super. Ct. Crim. R. 7(f); *Luttrell v. State*, 97 A.3d 70 (Del. 2014).
[3] *See* Del. Super. Ct. Crim. R. 12(b)(2) (emphasis added).

7

prior to trial. By failing to either file a pretrial motion to quash his Indictment or request a Bill of Particulars, Brooks waived any specificity objection.[4]

(20) Brooks' second argument is that the "Officer's testimony regarding the better quality of the live feed surveillance they viewed at the police station, in comparison to the DVD submitted as evidence by the State, amounted to impermissible vouching." In the two objections made by Brooks' attorney at trial, there was no assertion that the police witness "better quality" testimony constituted impermissible vouching. Accordingly, Brooks' vouching argument has been waived and may now only be reviewed on appeal for plain error.[5] To be plain, the error must affect substantial rights, generally meaning that it must have affected the outcome of the trial.[6]

(21) Assuming arguendo that vouching is a proper argument, Brooks cannot demonstrate plain error. In neither the police descriptions of what the officers viewed on the live surveillance feed at the police station nor in the later video recording played for the jury is it clear what object Brooks removed from the trunk of the silver Malibu automobile. All of the police officers' trial testimony

---

[4] See Brown v. State, 729 A.2d at 259, 263 (Del. 1999), rev'd on other grounds, Priest v. State, 879 A.2d 575, 581-82 (Del. 2005); Malloy v. State, 462 A.2d 1088, 1092 (Del. 1983).
[5] Del. Supr. Ct. R. 8; D.R.E. 103(d); Dougherty v. State, 21 A.3d 1, 3 (Del. 2011); Hoskins v. State, 14 A.3d 554, 560-61 (Del. 2011).
[6] United States v. Olano, 507 U.S. 725, 732-34 (1993); Wainwright v. State, 504 A.2d 1096, 1100 (Del.), cert denied, 479 U.S. 869 (1986).

8

was that Brooks removed a long object covered with cloth or clothing from the car trunk.

(22) Three of the police officers (Spicer, Willson and Sherwood) did testify that at the police station, while viewing the live feed, they thought Brooks may have obtained a firearm from the car trunk, but each of them also agreed that no actual weapon is visible on either the live feed or the video recording. Since it cannot be determined from either the live feed or the video recording what the object is that Brooks retrieved from the car trunk, it makes no difference whether the live feed was a better quality picture than the video recording. There is no plain error because the testimony of the police officers about video recording quality did not reasonably affect the outcome of Brooks' trial.

(23) Brooks next argues that there were several instances of prosecutorial misconduct. First, he claims that the prosecutor's direct examination of some State's witnesses was improper because in prefacing some questions the prosecutor restated the evidence, and that some of the prosecutor's statements amounted to impermissible editorializing. Second, Brooks argues that portions of the prosecutor's closing argument were improper because one statement violated the prohibition against "golden rule" arguments. Third, Brooks argues that the prosecutor allegedly misstated the evidence in his rebuttal closing remarks.

(24) This Court reviews allegedly improper prosecutorial remarks under a three part test developed in *Hughes v. State*.[7] These three factors include the closeness of the case; the centrality of the issue affected; and the steps taken to mitigate the effects of any error.[8]

(25) Brooks' first argument relates to the trial prosecutor's direct examination of a police witness. Brooks contends that the prosecutor was impermissibly restating the evidence in some questioning. At trial, Brooks' defense counsel stated: "Your Honor, [the prosecutor is] giving testimony in front of the jury as to whatever his perception is of what the evidence should be." The trial judge disagreed. The trial judge ruled that "he's not stating anything that has not already been elicited from testimony in this case." Nevertheless, the trial judge directed the prosecutor to "stop restating evidence."

(26) Brooks also argues on appeal that at times the prosecutor editorialized in some of his comments before the jury. The editorializing complaint also arose during the State's redirect examination of the first trial witness, Sergeant Spicer. The prosecutor was questioning Sergeant Spicer about actions by Jenkins, not Brooks, when he stated: "We know he had a gun in his pocket." Brooks' defense counsel objected, and the trial judge ruled: "Objection sustained." The

---

[7] 437 A.2d 559, 571 (Del. 1981).
[8] *See McCoy v. State*, 558, 2012, 2015 WL 292575, at *15 (Del. Jan. 20, 2015).

prosecutor's single sentence statement was not a question, and the defense objection was correctly sustained.

(27) Nevertheless, Brooks' attorney stated: "Mistrial, your Honor." The jury was escorted out of the courtroom, and the trial judge addressed Brooks' counsel by stating: ". . . you seem to have a trigger finger on yelling 'mistrial' at the first instance that there's a problem. This has got to stop. This is bordering on misconduct. Do you understand what I'm saying?" When Brooks' counsel explained, "I was saying that as an objection, your Honor," the trial judge responded: "You don't stand up and yell it in court."

(28) After the trial judge's exchange with Brooks' defense counsel, Jenkins' counsel moved for a mistrial. When the trial judge offered to give "an admonition to the jury to rectify any alleged prejudice that could be caused by any comments that [the prosecutor] made," Jenkins' counsel declined the offer and restated his mistrial motion.

(29) The trial judge took the defense mistrial applications under advisement and announced his ruling the following morning before the resumption of testimony. The trial judge considered the three *Hughes* factors in determining whether "improper remarks of the prosecutor amount to prosecutorial misconduct that warrants a mistrial." The trial judge ruled that it was "too early in the proceedings to declare a mistrial based on the *Hughes* factors." The reason for the

11

mistrial applications by Brooks and Jenkins was a statement concerning the conduct of Jenkins, not Brooks. Brooks has not demonstrated prosecutorial misconduct that related to him. The record reflects that the trial judge properly denied the motion for a mistrial as to Brooks.

(30) Brooks argues that there was prosecutorial misconduct when the "golden rule" was invoked during the State's closing argument. In his initial closing argument comments, the prosecutor stated: "Ask yourselves, ladies and gentlemen, if you're not doing anything wrong, why did they run from the police?" There was no contemporaneous defense objection to the statement. Later, after the trial judge gave the jury "a convenience break," a sidebar discussion occurred between the trial judge and counsel. The judge stated: "Mr. [prosecutor], you made a comment 'ask yourselves if you are not doing anything wrong; why did they run from the police?' That's improper. That was an improper comment. You are asking the jury to place themselves in the shoes of the police. That's not a proper comment, so I'm going to have to instruct the jury to disregard that comment."

(31) When the jury returned, a curative instruction was given to disregard the prosecutor's comment about asking themselves anything. This prompt curative

12

instruction to the jury was sufficient to cure any difficulty caused by the prosecutor's "golden rule" type argument.[9]

(32) Finally, Brooks claims that the prosecutor's rebuttal argument that the three defendants had "actual possession" of the two loaded firearms was a misstatement of the evidence. There was no contemporaneous defense objection to this remark. The record reflects that the prosecutor was responding to the earlier defense arguments that there was no DNA testing of the two firearms. The prosecutor's comment was a proper statement explaining that there was no need to test for DNA because the video and witness testimony was that at different times the three defendants all had possession of one of the firearms.

NOW, THEREFORE, IT IS ORDERED that the judgment of convictions of the Superior Court be, and the same hereby, is AFFIRMED.

BY THE COURT:

_____
Justice

---

[9] *See generally Steckel v. State*, 711 A.2d 5, 11 (Del. 1998) (curative instruction as to improper evidence); *Zimmerman v. State*, 628 A.2d 62, 66 (Del. 1993).