**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE | : | **ID No. 0809018844** |
| | : | RK 09-12-1214-02 MURDER 2nd |
| | : | RK 08-09-1286-02 PFDCF (F) |
| v. | : | RK 08-11-0556 02 PFDCF |
| | : | RK 08-11-0558 02 PFDCF |
| | : | RK 08-11-0560 02 PFDCF |
| | : | RK 08-11-0555 02 RECK END 1st (F) |
| TREMEIN D. HOSKINS, | : | RK 08-11-0557 02 RECK END 1st (F) |
| | : | RK 08-11-0559 02 RECK END 1st (F) |
| Defendant. | : | |

Submitted: July 5, 2022
Decided: September 16, 2022

## ORDER

*Upon Consideration of a Commissioner's Report and Recommended Denial of Defendant's Second Postconviction Relief Motion –* **ADOPTED**

On this 16th day of September 2022, having considered Defendant Tremein Hoskins' second motion for postconviction relief, the Commissioner's Report and Recommendation (the "Report") recommending that the Court deny his motion, Mr. Hoskins' appeal of that Report, and the record, it appears that:

1.    On October 9, 2009, a jury found Mr. Hoskins guilty of four counts of Possession of a Firearm During Commission of a Felony, 11 *Del. C.* § 1447A, and three counts of Reckless Endangering First Degree, 11 *Del. C.* § 604. The jury failed to reach a unanimous verdict on a Murder First Degree count. The Court then held a second trial on the murder charge and the second jury found Mr. Hoskins guilty of the lesser included offense of Murder Second Degree, 11 *Del. C.* § 635.

2.    After his convictions and a presentence investigation, the Court sentenced

Mr. Hoskins to forty-three years at Level V, followed by descending levels of probation. Thirty-five years of that sentence constituted minimum mandatory time. Mr. Hoskins then filed a direct appeal. On March 11, 2011, the Delaware Supreme Court affirmed his convictions.[1]

3. After Mr. Hoskins' unsuccessful direct appeal, he filed a motion for postconviction relief. With the assistance of postconviction counsel, Mr. Hoskins unsuccessfully litigated his first postconviction motion nearly eight years ago.[2] The Delaware Supreme Court then affirmed the Superior Court's decision denying him relief.[3] Mr. Hoskins then filed a *pro se* habeas corpus petition in the United States District Court for the District of Delaware. The District Court denied that petition as well.[4]

4. Mr. Hoskins now files a second motion for postconviction relief. In it, he claims that there is newly discovered evidence that came into being after his direct appeal and first postconviction motion. Namely, he contends that the State's ballistics witness at trial, Carl Rone (the "Expert"), had significant credibility and qualification issues pertinent to his trial testimony because of the Expert's *subsequent* misconduct. This evidence, Mr. Hoskins contends, overcomes Rule 61's procedural bar against subsequent postconviction motions. Specifically, he highlights (1) the Expert's lapse in certification that occurred years *after* his trial and (2) the Expert's conviction for falsifying business records that *postdated* Mr. Hoskins' two trials by approximately eight years. Because Mr. Hoskins contends that no procedural bar applies, the second part of his postconviction challenge addresses substance: that is, whether this "newly

---

[1] *Hoskins v. State*, 14 A.3d 554 (Del. 2011).
[2] *Hoskins v. State*, Del. Super., ID No. 0809018844 (January 28, 2014) (ORDER) (adopting Comm'r Report of June 28, 2013).
[3] *Hoskins v. State*, 102 A.3d 724, 735 (Del. 2014).
[4] *Hoskins v. Pierce*, 217 F. Supp. 3d 798, 813 (D. Del. 2016).

discovered" evidence, if known to the jury, would have changed the result of his trial.

5.       After he filed his motion, the Court referred the matter to a Superior Court commissioner as permitted by 10 *Del. C.* § 512(b) and Superior Court Criminal Rule 62.   The Commissioner who received the referral considered the parties' briefing and the record.   She then issued her Report and recommended that the Court deny Mr. Hoskins' motion as "untimely and successive."[5]   She refused his request to conduct an evidentiary hearing and explained why Rule 61(d)(2) requires the Court to dismiss his motion.[6]

6.       Presently, Mr. Hoskins appeals the Commissioner's Report.  He raises three objections.   First, he contends that the Commissioner erred when she found that the Expert's convictions and lapsed certification cannot be considered newly discovered evidence of actual innocence.   Second, Mr. Hoskins contends that because there is no procedural bar to his motion, his trial counsel's failure to object to a superfluous jury instruction was unreasonable.   He contends that this unreasonable choice prejudiced him to the extent that it would have likely changed the result.   Third, after assuming that his motion is not procedurally barred, he contends that the Expert's testimony was so unreliable, yet so central to the State's case, that he deserves a new trial.

7.       For the reasons discussed in the Report, the Court need not address his second and third arguments as to substance.   It need not because his motion is procedurally barred.

8.       As to the Court's scope of review for this appeal,  a judge who reviews a commissioner's recommendations and report must conduct a *de novo* review of the record to examine "those portions of the report or specified proposed findings or

---

[5] *Hoskins v. State*, ID No. 0809018844, Freud, Comm'r, at 15 [hereinafter Comm'r. Report] (June 15, 2022) (review pending).
[6] *Id.* at 16.

recommendations to which an objection is made."[7]   During the judge's review, he or she may request further evidence from the parties or recommit the matter to the commissioner for further action.[8]   At the conclusion of the review, the judge either accepts, rejects, or modifies the report in whole, or in part.[9]

9.     Since this is Mr. Hoskins' second motion for postconviction relief, he has a heavy burden when seeking to overcome Rule 61(d)(2)'s pleading requirements.[10] Namely, the Rule requires him to plead with particularity that either:  (1)  new evidence exists that creates a strong inference that he is actually innocent; or (2) there is a new rule of constitutional law that renders his convictions invalid.[11]   Mr. Hoskins does not allege that a new rule of law applies.   Rather, he relies upon the first exception.

10.     As explained in the Report, Mr. Hoskins' appeal fails because what he alleges is "new" evidence does not create a strong inference of innocence.   Namely, the unrelated fraudulent conduct that he pleads postdated both trials by eight years. Furthermore, the Expert's subsequent fraudulent conduct is different in kind than (1) the Expert's analysis, and (2) the Expert's opinions based upon that analysis. Similarly, any lapse in the Expert's certification, after the trials, bears no relationship to his testimony during the trials.   When accepting Mr. Hoskins' allegations as true, new information regarding the Expert's fraudulent business record filings and lapsed certification has no nexus to his prior trial testimony.

**WHEREFORE**, after considering Mr. Hoskins' objections to the Report, and a *de novo* review of the record, the Court **ADOPTS** the Report attached as Exhibit A in its entirety.   For the reasons explained above and for those explained in the Report,

---

[7] Super. Ct. Crim. R. 62(a)(5)(iv).
[8] Super. Ct. Crim. R. 62(a)(5)(iv).
[9] *Id.*
[10] Super. Ct. Crim. R. 61(d)(2)(i) & (ii).
[11] *Id.*

Mr. Hoskins' second motion for postconviction relief must be **DENIED**.

**IT IS SO ORDERED.**

<u>/s/Jeffrey J Clark</u>
Resident Judge

JJC
oc: Prothonotary
cc: The Honorable Andrea M. Freud
Trial Counsel
Postconviction Counsel of Record

# Exhibit
# A

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| | : | ID. No. 0809018844 |
| STATE OF DELAWARE, | : | RK 09-12-1214- 02 MURDER 2nd |
| | : | |
| v. | : | RK 08-09-1286-02 PFDCF (F) |
| | : | RK 08-11-0556 02 |
| TREMEIN D. HOSKINS, | : | RK 08-11-0558 02 |
| | : | RK 08-11-0560 02 |
| DEFENDANT. | : | |
| | : | RK 08-11-0555-02 RECK END 1ST (F) |
| | : | RK 08-11-0557-02 |
| | | RK 08-11-0559-02 |

**COMMISSIONER'S REPORT AND RECOMMENDATION**

**Upon Defendant's Second Motion for Postconviction Relief
Pursuant to Superior Court Criminal Rule 61**

Jason C. Cohee, Esq., Deputy Attorney General, Department of Justice, for the State of Delaware.

Herbert W. Mondros, Esq. for Defendant.

FREUD, Commissioner
June 15, 2022

The Defendant, Tremein D. Hoskins ("Hoskins"), was found guilty on October 9, 2009, by a jury of four counts of Possession of a Firearm During Commission of a Felony, 11 *Del. C*. § 1447A and three counts of Reckless Endangering First Degree, 11 *Del. C*. § 604. The jury was unable to reach a unanimous verdict on the one count of Murder in the First Degree. The Murder count proceeded to a second trial as a lesser included count of Murder in the Second Degree. On December 10, 2009, the second

7

jury found Hoskins guilty of Murder in the Second Degree. Prior to the second trial the State entered a *nolle prosequi* on one count of Conspiracy Second Degree. On January 26, 2010, Hoskins was sentenced to forty-three years at Level V, followed by varying levels of probation. Thirty-five years were minimum mandatory time.

A timely Notice of Appeal to the Delaware Supreme Court was filed. Hoskins' counsel raised three issues on appeal which the Supreme Court classified as follows:

> Hoskins raises three arguments on appeal. First, Hoskins contends that the trial judge committed plain error in failing to instruct the jury specifically on how it should evaluate the credibility of the testimony of the alleged accomplice. Second, Hoskins contends that the trial judge committed plain error by failing to instruct the jury that it must agree unanimously upon the particular act or acts of criminality. Third, Hoskins contends that the trial judge committed plain error in admitting a witness's prior out-of-court statements pursuant to title 11, section 3507 of the Delaware Code.[12]

The Supreme Court affirmed Hoskins' conviction and sentence as to all of his claims.[13] The mandate issued on March 11, 2011.

Next, Hoskins, through new counsel, filed a Motion for Postconviction Relief pursuant to Superior Court Criminal Rule 61. In his first Postconviction Motion, Hoskins raised multiple grounds for relief including ineffective assistance of counsel. This Court denied Hoskins' Motion and that ruling was affirmed by the State Supreme Court on appeal.[14] Next, Hoskins filed a Federal Habeas Corpus Motion which was likewise denied.[15] Finally, Hoskins filed the pending second Motion for Postconviction

---

[12] *Hoskins v. State*, 14 A.3d 554, 556 (Del. 2011).
[13] *Id.* at 566.
[14] *State v. Hoskins*, Aff'd 102 A.3d 724 (Del. 2014)
[15] *Hoskins v Pierce*, 217 F.Supp.3d 798 (D. Del. Nov. 16, 2016) See also *Hoskins v. Vaughn*, No.16-4331 (3d Cir. April 18, 2017) denying application Certificate of Appealability

Relief through counsel on January 28, 2021. The matter was set for briefing and there were several extensions to the briefing order.

## FACTS

The following is a summary of the facts as noted by the Supreme Court in its opinion:

> Late one September evening, fifteen to twenty people were socializing outside of a community known as Capital Green in Dover.  The group was 'just standing out there talking, having fun.'  Music could be heard playing from one of their cars.  The group included Brandon Beard, Leia Tolson, Jermaine Brown, Lentia Brown, Ashley Walton, and Lisa Moaney.
>
> Meanwhile, less than two miles away in a residential area known as Capitol Park, another group of individuals was preparing to make the short trip to Capital Green.  That group included Tremein Hoskins, Brett Hoskins, Darryl Copperhead, and Alonzo West. [FN2] Those four men got into West's burgundy Buick.  West drove the car, Tremein Hoskins sat next to him in the front passenger seat, and Brett Hoskins and Copperhead sat in the back of the car. The group stopped at a nearby Royal Farms to get gas and continued on to Capital Green. [FN3]
>
>> FN2. Although never confirmed, the two groups allegedly were involved in an ongoing dispute.  The State alleged that the Capitol Park group was targeting Jermaine Brown on the night of the crime.  In a statement to police, West explained that members of the Capital Green group assaulted Copperhead and that the Capitol Park group may have been retaliating.
>>
>> FN3. At Hoskins' trial, West testified that, during the stop at Royal Farms, Brett Hoskins exited the burgundy Buick with a gun and got into a Jeep Cherokee that also was traveling to Capital Green.

9

Shortly thereafter, Leia Tolson observed at least two vehicles approach the crowd at Capital Green. First, a Jeep Cherokee drew near, and then a burgundy Buick 'slowed down in front of [the crowd]' and 'the person in the back seat rolled their window down.' At that time, Tolson knew 'something wasn't right,' and that 'some shots or something was going to get fired because of the way the cars [ ] came in at that time of night, you don't usually see cars come in like that.' The cars parked one behind the other, not far from the crowd. [FN4] Then Tolson 'just heard gunshots' coming from 'where the cars had parked at.'[FN5] Although it is unclear how many shots were fired that night, Tolson heard 'at least fifteen gunshots.'[FN6] Tolson and the others then started to run to Lisa Moaney's nearby house.

> FN4. Tolson's testimony was not consistent entirely. She also testified that '[t]here was at least four cars out there.'

> FN5. Tolson testified: 'That wasn't just one gun. Yeah, it would have been more than one person shooting.'

> FN6. Lisa Moaney testified that she heard 'six or seven' shots. Officer Jeffrey S. Welch, who was patrolling nearby, testified that he heard 'a string of five, then a pause, then a string of four' shots.

Tolson looked back 'to make sure that [they] didn't leave anybody outside.' She saw Brandon Beard 'on his knees; and he was holding his chest with one of his arms out.' Tolson and a friend then carried Beard into Moaney's house and laid him on a couch. Beard 'patted his chest' and informed his friends that he had been hit. Then, Tolson observed 'the blood just [ ] coming through his sweats.' Tolson called 911 from her cell phone. Beard stated, 'I can't breathe.' Beard then told his friends: '[c]all my mom' and '[d]on't leave me.' Beard repeatedly stated: 'I am going to die' and [t]ake care of my kid.' Shortly thereafter, paramedics arrived and transported Beard to nearby Kent

General Hospital. Dr. Samuel Wilson, who was on call that night received a page and reported to the hospital. Doctors began operating on Beard at approximately 2:00 a.m., but they were unable to save him. Beard was pronounced dead at 5:36 a.m. Doctor Judith Tobin identified the cause of death as 'irreversible shock due to massive hemorrhage due to a gunshot wound to the left lung and the left subclavian vein.' Tobin opined that Beard 'had his back to where the bullet came from.'

Later that day, Detective Robert Roswell interviewed Tremein Hoskins. First, Hoskins told Roswell that he was not at Capital Green when Beard was shot. Later in that interview, he recanted and admitted that he was at Capital Green, but stated that he did not see the shooting. During that interview with Tremein Hoskins, Roswell learned that Tremein and Brett Hoskins were in a burgundy Buick on the night of Beard's death and that a man named 'Lonny' supposedly drove the car.

Two days later, Roswell and another detective drove to Capitol Park, where they believed 'Lonny' resided. As they approached the entrance to the development, Roswell saw a burgundy Buick pulling out of the Capitol Park entrance. Roswell stopped the vehicle and its driver, Alonzo West. Roswell searched the vehicle, with West's consent, but found nothing related to the homicide. West arrived at a nearby police station approximately thirty minutes later and voluntarily discussed the events of the night in question. West stated that he was playing pool with friends earlier during the night of the shooting and that he had drank one beer. He also stated that he went to various liquor stores in Dover and then returned to Capitol Park. When asked who got into West's car later that night to go to Capital Green, West replied: 'Well, Copperhead, as well call him, and me and Tre[mein]. And that is it.'[FN7] West then admitted that he owned a Ruger 9mm,[FN8] but that neither he nor Copperhead exited the vehicle or fired a gun that night. But West stated that Hoskins used his gun:

11

FN7 Later in the interview, the detective stated: 'They said—the guys, got out of the burgundy car, that were shooting. So, you need to be very clear on exactly who was with you.' West replied: 'It was Tre[mein], um, Copperhead.'

FN8. West also stated that another man, 'Boojie,' had a gun that night and that '[i]t may have been a nine too.'

Detective: So who did you let use your gun? Was it somebody in your car?

West: Hm, yeah.

Detective: Which one?

West: Ah, Tre[mein].

Detective: Ok, now afterwards, does he give it back to you?

West: Well, yeah.

Detective: All right. Does he get out and shoot, or does he shoot out the window, or what?

West: Hm, got out [FN9]

FN9. Earlier in the interview, in contrast, West stated: "Listen. Like I said, I don't know if anybody got out, if Doobie got out. I don't know.

* * *

Detective: How many times you figure he shot?

West: Who?

Detective: Tre[mein].

12

West: Could only shoot five rounds.

At the end of the interview, Roswell obtained West's consent to retrieve the Ruger 9mm from West's girlfriend's trailer. Roswell found a blue gym bag, which contained a gun case. That gun case contained a Ruger 9 mm handgun. The Ruger 9mm contained a magazine, but no bullets. Roswell also found a receipt for the Ruger 9mm that identified West as its purchaser. The gym bag also contained, among other things, 'a Wal-Mart bag with a box of .22 -caliber bullets, a 50—count box, and all the bullets were in the box.'

Roswell then interviewed Tremein Hoskins again. In that interview, Hoskins finally admitted that he fired West's gun on the night of Beard's death, but Hoskins did not describe the type of gun he fired. In his previous interview, Hoskins had denied even observing the shooting. Hoskins explained his recantation as follows: "I didn't know what was going on yet. I didn't know what was what. I am not—that's something that I don't do all the time, so I wasn't involved in anything like that on any other occasion.'

Back at the scene of the crime, police recovered twelve spent shell casings. Carl Rone of the Delaware State Police Forensic Firearms Service Unit determined that seven were fired from one gun and five were fired from another. When police recovered those spent shell casings, the group of five and the group of seven were approximately twelve to fifteen feet apart. Rone determined that all were fired from 9mm handguns. No. 22 caliber casings were found. Rone analyzed test rounds fired from the Ruger 9mm that Roswell recovered from West's residence and determined that the bullet that killed Beard had been fired from that Ruger 9mm. Rone also determined that of the twelve shell casings that were recovered from the crime scene, five matched West's Ruger 9mm.[FN10]

> FN10. Police never recovered the other 9mm handgun that was fired on the night of the crime.

There was additional forensic evidence, but it proved inconclusive. Corporal Marc Gray found one fingerprint on the magazine of West's Ruger 9mm. The fingerprint was on the middle of the magazine. So it likely resulted from that person either loading the magazine with bullets or loading the gun with the magazine. Police determined that the fingerprint did not match Tremein Hoskins' fingerprint.

Approximately one year after his first statement to police, West gave a second interview in connection with a plea. He stated: '[Hoskins] asked me yo can you go get you um get you um get your gun. I got you this and that. He asked me about 3 or 4 times so.' West confirmed that he drove the burgundy Buick that night and stated that 'Tremein, Brett, and um Copperhead was in the car,' but when they stopped at Royal Farms, 'Brett got out the car and jumped [ ] in the Jeep.' FN11 West stated that he followed a Jeep into Capital Green and the following occurred:

> FN11. West stated that he could not recall if anyone spoke during the ride because he 'was drinking a little bit' that night.

[The Jeep] was like little bit behind me I mean I was like like here may been on the other side like little back in back or whatever and then me [ ] Trem[e]in and Copperhead were sittin in the car then um next thing we was talking next thing we heard uh was bop bop bop then Tremein jumped out the car he grabbed the gun, jumped out the car me and Copperhead stayed in the car and then when uh when I heard shots (unintelligible) you know what I mean (unintelligible). West stated that the group then returned to Capitol Park, discussing what had just occurred. West recalled:

Yeah and um um Brett and um (unintelligible) about something and (unintelligible) said um about mentioned about um yeah I shot up in the air whatever something like that. Didn't nobody shoot up in the air. The um Brett said

um pointed to what 2 or 3 people you all see what I done right.  You see what I done.  You see what I done.[FN12]

> FN12.  West also stated that between the time of his first and second statements, he saw Tremein in prison: West recalled: 'He said well I sh I shot up in the air and that's all he said.  You know he said maybe 2 3, times and well I shot up in the air.  I ain't shoot at nobody.  I I just shot up in the air.'

- - -

After declaring a mistrial as to the murder first degree and conspiracy first degree counts, the Superior Court scheduled another jury trial.  The State dropped the conspiracy count and proceeded on the lesser-included charge of murder second degree.

West testified at Hoskins' second trial.  When asked why Hoskins exited the burgundy Buick, West explained: 'It was a couple of shots.  But then he had jumped out of the car.  Grabbed the gun, and jumped out of the car.'  West also testified that, upon Hoskins' request, West brought his Ruger 9mm with him that night and that Hoskins grabbed it from under the armrest when exiting the car.  West recalled that he heard 'a couple more shots,' and then Hoskins got back into the car 'maybe two, three seconds after that.'  West testified that '[b]etween four and five' bullets were in the gun when Hoskins exited the car and that the gun was empty when Hoskins returned.  As for the blue gym bag that police recovered from West's home, West testified that everything in it belonged to him,[FN14] except the .22 caliber rounds.[FN15]  Despite pleading guilty to conspiracy first degree, West testified that he did not conspire with anyone on the night of Beard's death.  West was unable to explain inconsistencies that existed between his prior police statement and his testimony at trial.

> FN14.  The blue gym bag contained, among other things, the Ruger 9mm, a receipt for that gun with West's name on it, prescription bottles with West's

15

name on it, bills addressed to West, and a cell phone charger.

FN15. When asked why the .22 caliber rounds were in his bag, West explained: 'Like I told you, somebody had left them in my car—left them in my car when I went in my house. I checked my car and stuff, and I seen the bag in the back. I opened it up; I seen there was 22 shells in it. So [one or two months before Beard's death], I took the shells inside the house instead of leaving them in the car. I put them in the bag. So if I ran into them, I would ask them: Yo, you left your things. I would have gave them back to him.' When asked why he put someone else's .22 caliber rounds in a bag that contained all of his own personal items, West explained: 'The reason I put them in the bag was because there was a little child in the house. So, I put them in a bag where it would be safe at where he couldn't get to them.'

Tremein Hoskins also testified at his second trial. He testified that he did not shoot Brandon Beard and that he shot a .22 caliber revolver, not a Ruger 9mm. Hoskins stated that West had a .22 revolver that night and that West handed that gun to him. Hoskins testified that the .22 caliber revolver was 'black and silver—or chrome, black and chrome; either one of those' and that West had owned it only for a few months. But, Hoskins recalled that he had used the .22 caliber revolver to 'shoot beer bottles and things like that.' Hoskins testified that he shot the .22 caliber revolver into the air on the night that Beard was killed '[l]et them know I had a gun too, and just to scare somebody off.' Lastly, Hoskins testified that West refers to the .22 caliber as a 'walkie' because 'it's unregistered, and he carries it with him.'[FN16]

FN16. Police never recovered the .22 caliber revolver that Hoskins described.

16

At the prayer conference, defense counsel did not request accomplice credibility or single theory unanimity jury instructions.[FN17] But, the State requested a general accomplice liability instruction, which the trial judge gave.[FN18] The jury found Hoskins guilty of murder second degree, and for that conviction, the trial judge sentenced him to forty years at Level V, with a mandatory prison term of fifteen years. This appeal followed.

> FN17. Defense counsel also did not request those jury instructions at Hoskins' first jury trial When asked why defense counsel did not request an accomplice credibility jury instruction, appellate counsel, who was also defense counsel, stated at oral argument: 'It was not requested. . .It was a matter of oversight. . . Looking back on it, it should have been done, but it's a matter of oversight.'

> FN18. The trial judge also gave a general instruction on the credibility of witnesses as follows: 'You are the sole judge of the credibility of each witness including the defendant and of the weight to be given to the testimony of each. You should take into consideration each witness' means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of his/her testimony; the consistency or inconsistency of his/her testimony; the motives actuating him/her; the fact, if it is a fact, that his/her testimony has been contradicted; his/her bias, prejudice, or interest, if any; his/her manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the credibility of his/her testimony.'[16]

## HOSKINS' CONTENTIONS

In this corrected Second Motion for Postconviction Relief, Hoskins, through counsel raises the following three grounds for relief:

Ground One:        The interests of justice, and Rule 61(d)(2)(i), require Petitioner be granted a new trial based

---

[16] *Hoskins v. State*, 14 A.3d 554, at 556-559 (Del. 2011)

on monumental credibility issues surrounding the State's expert witness, discovered after direct and Postconviction review, where Petitioner's conviction hinged on the witness's testimony

Ground Two: Based on the first jury's acquittal of the intent to kill element, trial counsel's allowing this Court to instruct on intent to kill, constituted a miscarriage of justice, and separately warrants Rule 61 (d)(2)(i) relief.

Ground Three: Rone's match testimony was critical in obtaining convictions in both trials – there is no longer any basis to assume its reliability.

## DISCUSSION

Under Delaware law, this Court must first determine whether Hoskins has met the procedural requirements of Superior Court Criminal Rule 61 before it may consider the merits of his postconviction relief claim.[17] The Court considers a Motion for Postconviction Relief under Rule 61 as a matter of discretion.[18] Prior to addressing the merits of a Rule 61 motion, the Court must first consider and apply the procedural bars set forth in Rule 61.[19] "To protect the procedural integrity of Delaware's rules, the Court will not consider the merits of a postconviction claim that fails any of Rule 61's procedural requirements."[20] "Rule 61 is intended to correct errors in the trial process, not to allow defendants unlimited opportunities to relitigate their convictions."[21]

---

[17] *Bailey v. State,* 588 A.2d 1121, 1127 (Del. 1991).
[18] *Durham v. State*, 2017 WL 5450746, at *1 (Del. Nov 13, 2017)
[19] *Id*.; *Wright v. State*, 91 A.33d 972,985 (Del.2014); *Maxion v. State*, 686 A.2d 148, 150 (Del. 196) (Citing *Younger v. State*, 580 A.2d 552 ,544 (Del.1990)).
[20] *State v. Page*, 2009 WL 1141738, at *3 (Del. Super. Apr.28, 2009).
[21] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013); *Walls v. State*, 2016 WL 4191922,at *1(Del. Aug.1, 216) ("[The Court] will not continue to invest scarce judicial resources to address untimely and repetitive claims.");

The version of Rule 61 in place at the time a defendant files his or her motion for postconviction relief controls.[22] Here, Hoskins filed his corrected second Rule 61 motion on January 28, 2021. Accordingly, Hoskins' motion is governed by the version of Rule 61 existing after the substantial amendments effective June 4, 2014.[23]

Rule 61(i) establishes four procedural bars to postconviction relief.[24] Rule 61(i)(1) provides that a motion for postconviction relief must be filed within one year of a final judgment of conviction.[25] Under Rule 61(i)(2), successive motions are barred, unless under Rule 61(d)(2)(i), the movant "pleads with particularity" that "new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted;" or, under Rule 61(d)(2)(ii), that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or this Court, applies to his case and renders his conviction invalid.[26] Rule 61(i)(3) bars consideration of any claim not asserted in the proceedings leading up to the judgment of conviction unless the movant can show "cause for relief from the procedural default" and "prejudice from violation of movant's rights." [27] Rule 61(i)(4) provides that any claim that has been formerly

---

*Flamer v. State*, 585 A.2d 736, 745 (Del.1990) ("It is a matter of fundamental import that there be a definitive end to the litigable aspect of the criminal process.") I also note that Hoskins has had multiple opportunities to litigate his claims both in this Court, before the State Supreme Court, the Federal District Court, and before the Third Circuit Court of Appeals.

[22] *See, e.g., Durham*, 2017 WL 5450746, at *2 (applying version of Rule 61 in effect when defendant filed Rule 61 motion); *Coles v State*, 2017 WL 3259697, at *2 (Del. July 31, 2017) (same); *Redden v. State*, 150 A.3d 768, 772 (Del. 2016) (same); *Bradley v. State*, 135 A.3d 748, 757 n.24 (Del. 2016) (same); *Jones v State*, 2015 WL 6746873, at *1 & n.4 (del. Nov. 4, 2015) (same); *Turnage v. State*, 2015 WL 6746644, at *1 (Del. Nov. 4,2015) (same); *Collins v. State*, 2015 WL 4717524, at *1 (Del. Apr. 28, 2016) ("Superior Court erroneously applied the provisions of Superior Court Rule 61 that were in effect before the appellant filed his second Rule 61 Petition on September 1, 2015.")

[23] Rule 61 was substantially amended in June 2014 with the adoption, among other things, of new procedural bars for second and subsequent motions found in Rule 61 (d)(2) and referenced in Rule 61(i)(5). These new procedural requirements apply to any postconviction motion filed after June 4, 2014.

[24] Super. Ct. Crim. R. 61(i)(1)-(4)

[25] Super. Ct. Crim. R. 61(i)(1).

[26] Super. Ct. Crim. R. 61(i)(2)

[27] Super. Ct. Crim. R. 61(i)(3).

adjudicated is thereafter barred.[28] Rule 61(i)(5) provides that any claim barred by Rule 61(i)(1)-(4) may nonetheless be considered if the claim is jurisdictional or otherwise satisfies the pleading requirement of Rule 61(d)(2)(i) or (d)(2)(ii).[29]

Hoskins' Motion for Postconviction relief is clearly barred under Rule 61(i)(1) and (2). Hoskins' convictions became final in February 2011, when the Delaware Supreme Court issued its mandate. Hoskins filed this corrected second Motion for Postconviction Relief in January 2021, nearly ten years after his conviction was final. Accordingly, Hoskins' second Rule 61 motion is procedurally barred by Rule 61(i)(1)and (2), as untimely and successive,[30] and should be summarily dismissed under Rule 61 (d)(2)[31] unless Hoskins can show his claims satisfy the exceptions to the procedural bars.

There are no "miscarriage of justice" or "interest of justice" exceptions to the procedural bars of Rule 61(i)(1) and (2) available to Hoskins as a result of the June 2014 amendments of Rule 61. Hoskins can only overcome the procedural default and avoid summary dismissal of his untimely and successive postconviction motion, if he presents a claim that the Court lacked jurisdiction[32] or pleads with particularity that:

---

[28] Super. Ct. Crim. R. 61(i)(4).

[29] Super. Ct. Crim. R. 61(i)(5).

[30] The extent Hoskins appears to be attempting to relitigate previously adjudicated claims, such claims are procedurally barred by Rule 61(i)(4), as previously adjudicated. Further, to the extent Hoskins could have raised his claims in his direct appeal, those claims are barred by Rule 61(i)(3) as a result of Hoskins' failure to assert these grounds for relief in the proceedings leading up to conviction, because he has not established cause for failure to do so or prejudice from a violation of his rights.

[31] *Merritt v. State*, 2018 WL 5831275 (Del. Nov. 5, 2018) (affirming summary dismissal of second Rule 61 motion under Rule 61(d)(2)); *Sykes v. State*, 2018 WL 49*32731, at *1-2 (Del. Oct.10, 2018); *Young v. State*, 2018 WL 2356412, at *1 (Del. May 23, 2018) (same); *Williams v. State*, 2018 WL 2110967, at *1 (Del. May7, 2018) (same); *Holmes v. State*, 2018 WL 637312, at *1 (Del. Jan. 30, 2018) (same); *Durham*, 2017 WL 5450746, at *2 (same); *State v. Jones*, 2016 WL 7338591, at *7-8 (Del. Super. Dec.16, 2016), Aff'd, 2017 WL 47535974 (Del. Oct. 10, 2017) (same); *Coles*, 2017 WL 3259697, at *1-2 (same); *State v. Worley*, 2018 WL 3302806, at *2-3 (Del. Super. July 3, 2018) (Summarily dismissing defendant's second Rule 61 motion as a successive motion under Rule 61(i)(2), because defendant could not meet pleading requirements of Rule 61(d)(2)).

[32] Super. Ct. Crim. R. 61(i)(5).

(1) "new evidence exists that creates a strong inference that [he] is actually innocent in fact of the act underlying the charges of which he was convicted," or (2) a new rule of constitutional law made retroactive to cases on collateral review applied to his case and rendered his convictions invalid.[33] Hoskins fails to satisfy these pleading requirements, and thus, his motion must be "summarily dismissed" under Rule 61(d)(2) without consideration of the merits.[34]

Hoskins does not present a claim under Rule 61(i)(5) that the Court lacked jurisdiction over his convictions. Hoskins also does not plead the existence of a retroactively applicable rule of constitutional law to his case under Rule 61(d)(2)(ii). Instead, Hoskins claims to be in possession of "newly discover evidence" demonstrating his innocence, thereby satisfying the actual innocence exception to the procedural bars. Specifically, Hoskins asserts that State Forensic Firearms Examiner, Carl Rone's recent arrest and subsequent guilty plea demonstrate that he is actually innocent of his charges. Rone was indicted in 2018 for criminal acts that occurred over a period of time in 2016-2017. He pled guilty to Theft by False Pretense and Falsifying Business Records in 2018. The allegations involved Rone falsifying payroll records and being paid for time when he was not working. The allegations did not involve mishandling evidence, falsifying documents related to his examinations of evidence, or the reports he produced and to which he later testified.

Hoskins has not proffered any new evidence that calls into question Carl Rone's testimony in the case. In postconviction, Hoskins retained forensic ballistics examiner Frederick Wentling to provide evidence in support of his motion. Hoskins includes a September 15, 2020 report from Wentling which, he contends, invalidates Carl Rone's testimony.  He is mistaken. This 2020 report is not Mr. Wentling's first exposure to

---

[33] Super. Ct. Crim. R. 61(d)(2)
[34] *Id.*

21

this case. Hoskins retained Wentling in 2009 to provide forensic ballistics analysis in support of his defense, at trial.[35] Wentling and Hoskins' trial counsel were given access to Carl Rone, his case file and his laboratory (standard practice) to review the ballistics evidence in this matter.[36] On September 11, 2009, Hoskins revealed to the State the substance of Wentling's opinion.[37] Ultimately, Hoskins elected not to call Wentling in his defense at trial. Nothing contained in Wentling's 2020 report is premised on evidence unavailable to him in 2009 (when he actually handled the ballistics evidence). Hoskins made a tactical decision by not calling Wentling as a witness. Hoskins' allegations fail to make even a preliminary showing of his actual innocence of the charges he committed in 2008. The only thing that has changed is Rone's conviction in 2018, for crimes committed after Hoskins' trial. Which had no bearing on his firearm competence.

In his reply to the State's brief, Hoskins attempts to argue that the fact that his current/former expert, (who Hoskins now claims totally invalidates Rone's testimony), was consulted by Hoskins' trial attorney and reviewed the evidence fully prior to trial, is irrelevant to this Court's determination concerning whether he has presented "new evidence of actual innocence." Hoskins is incorrect. The ballistic evidence is the same, as it was when Wentling had the opportunity to review the evidence before the trial. Had Wentling concluded that it pointed to Hoskins' innocence, it could have been presented at trial. Hoskins' circular argument appears to be that because we now know that Rone falsified payroll records, (not forensic evidence), for his financial gain, that somehow that changes the actual facts of his case; it does not. Hoskins presents no evidence that would lead the Court to believe that Rone's testimony in his trial was false. If he had issues with Rone's "methods" etc., he had the opportunity at his trial to

---

[35] Letter from trial counsel referenced at Event number 14 in the Criminal Docket.
[36] See Paragraph 7 of State's Response to Defendant's Motion *in Limine*. Daubert Hearing
[37] Letter from trial counsel State's Exhibit D

present that evidence with the very same expert he now wishes to use. That evidence is not new.

Hoskins also contends that Carl Rone's testimony was the only evidence offered by the State to refute the defense ricochet theory. Hoskins is mistaken. Dr. Judith Tobin, the State's forensic pathology expert, conducted the autopsy of Brandon Beard and testified at Hoskins' trial.[38]  Dr. Tobin described the entry would as follows:

> Now, this is the entry wound.
> This is his back – here is the back of his head; and here is the entry wound. You can see it is quite round. It's a typical entry wound really. It's round.
> There is slight beveling, which is – part of the wound is more shallow. In other words, if the bullet goes – say this is the person. If the bullet goes straight, then there would be no beveling; it would be round.
> If the bullet goes in from – I want to say the bottom, down here – if it goes in slightly at an angle, you get a flattening or more shallow beveled edge here. So, it doesn't go straight down on that side, and then it goes at an angle.
> So, this beveling would imply that the bullet sort of came in at an angle like this.[39]

Dr. Tobin further explained the beveling as follows: "See how this part is shallower and this is deeper here, so that is probably came in at an angle like that or like that."[40] Dr. Tobin went on to explain that the bullet entered the body and proceeded through it at a 45-degree angle going from back to front and from " inferior to superior, that's from down to up."[41]  She also explains that the fact that the bullet went through at a 45-degree angle did not necessarily mean that the bullet was fired at  a 45-degree angle because Beard's body may have been bent over at the time he was shot.

---

[38] Tobin Transcript.
[39] Tobin Transcript, page 65 L 7-22
[40] Tobin Transcript, page 66 L 3-5
[41] Tobin Transcript, Page 68 L21-22

Especially if he was running trying to escape the gunfire.[42] Finally she stated that the beveling on the wound was "slight, slight."[43] All of this testimony, corroborates Rone's testimony that the bullet had not ricocheted prior to entering Beard's back.

Of course, Dr. Tobin's evaluation of the entry wound was different than the evaluation offered by the defendant's expert, Dr. Arden. The jury was able to evaluate both opinions and come to its decision. Additionally, as noted by the Supreme Court in its opinion on Hoskins' direct appeal, Alonzo West stated that Hoskins did not fire the gun up in the air, in direct contradiction of Hoskins testimony, and was evidence that Hoskins was in fact firing the weapon into the crowd. Of note also, is the fact that Hoskins changed his story several times. Initially Hoskins said he wasn't at the scene. Next, he admitted he was there but didn't see any shooting. Subsequently, at a second interview he finally admitted to shooting "up in the air" but didn't say what type of gun he used. Only after hearing that the bullet that killed Beard was a 9mm did Hoskins claim to have used a .22 caliber revolver.[44] Only 12 - 9mm shell casings were found at the scene. All of this evidence further contradicted Hoskins self-serving story, which apparently the jury simply did not believe.

Additionally, of the 12 - 9mm shell casing that were found, 7 of them were located together and the other 5 were located in another grouping several feet away from the cluster of 7 casings. Importantly, West's Ruger 9mm gun, which Hoskins was accused of using, had only a 5-shell capacity and it was one of those bullets that caused Beard's death. West also testified that Hoskins had asked him to bring his gun when they left Capitol Park. Hoskins in his motion attempts to suggest that there were "multiple" guns used, i.e., several 9mm and possibly a .22 revolver and that the crowd

---

[42] Tobin Transcript, Pages 70-76
[43] Tobin Transcript, Page 76
[44] The fact that he claimed to have shot a revolver is also interesting since revolvers typically do not have shell casings thus providing a "reason" for why no .22 casings were located at the scene

may have been shooting at Hoskins. However, the one trained police officer who heard the shots testified that he heard two bursts of gun fire. First a string of five shots, followed by a string of four shots. Unlike the civilian witness, Officer Welch, as a trained police officer, was more likely to have a better idea of the precise number of shots fired. His testimony is closer to the physical evidence found on the scene of one cluster of 5 shells and a separate cluster of 7 shells confirming the fact that only the two 9mm guns were used. Interestingly, the fact that the first cluster Officer Welch heard was a burst of five shots could indicate that it was West's Ruger 9mm that killed Beard was the first gun to have been fired. Consequently, wasn't shot out of self-defense or fear as Hoskins claimed. In this case there was far more evidence supporting Hoskins' guilt than merely Rone's testimony. Hoskins had ample opportunity to contradict Rone's testimony during his trial with the very witness he now alleges supports his actual innocence.

On August 14, 2009, Hoskins filed a Motion *in Limine*, or in the alternative, for a Daubert Hearing seeking to preclude the State from introducing Rone's ballistic testimony. As noted by the State in its response, it answered this Motion on August 28, 2009. On July 1, 2009, the Defendant gave notice that Frederick M. Wentling was retained to provide "Forensic Ballistics Analysis" in the matter. The State made Carl Rone, his entire case file and his laboratory available to defense counsel and his expert (Frederick M. Wentling). As a result of that review, Wentling's opinion was provided by defense counsel letter on September 11, 2009. Specifically, Hoskins informed the State:

> I expect that Mr. Wentling will testify that, based on his knowledge, training and experience in the field of forensic ballistics and firearm toolmark analysis, the evidence is not inconsistent with the following: (1) the bullet that struck the

25

victim was fired from a distance, (2) the bullet ricocheted or deflected off of a surface prior to striking the victim, and (3) the bullet struck the victim and traveled at a 45-degree angle. Mr. Wentling is also expected to testify about the range and trajectory characteristics associated with a Ruger caliber 9mm Luger semi-automatic pistol, model P89-DC[45]

On September 23 and 28 of 2009, the Superior Court heard testimony and argument on Hoskins' Motion. The testimony included lengthy direct, cross and Court questions regarding Rone's methods. The Superior Court denied defendant's Motion on September 28, 2009, and Carl Rone testified to his conclusions at trial.

In October 2018, this Court, in *State v. Pierce*, [46] concluded that Rone's expert testimony regarding ballistics was sufficiently dissimilar and attenuated from his falsification of his payroll records to not be an issue, finding:

> The Court's limited finding for purposes of this hearing regarding Mr. Rone's falsification of business records creates a significant issue that the Court has carefully weighed. Mr. Pierce is correct in that payroll records, chain of custody records, and testing records are all "business records." In the Court's overall evaluation, however, the Court does not find the same motivation to be present when submitting records seeking extra pay that was not earned, compared to submitting allegedly false evidence logs and testing documentation when handling evidence. There is significant dissimilarity between these two types of business records. Likewise, the two types of duties at issue regarding Mr. Rone's payroll submissions versus his expert testing and evidence processes have significant differences. As a final matter in the Court's evaluation, Mr. Rone's false

---

[45] State's Exhibit D.   I note that Dr. Tobin also states that the bullet traveled "through the body" at a 45-degree angle, but the actual angle the bullet entered the body could have been quite different depending on what position Beard's body was in at the time he was struck by the bullet.
[46] 2018 WL 4771787 (Del. Super. Oct. 1, 2018)

verification in his payroll records occurred in 2016 and 2017. In contrast, Mr. Rone's relevant participation as a link in the chain of custody for the subject casing was in 2009.[47]

Since that time, there have been other similar rulings, in *State v. George*, the Superior Court stated that there was "nothing regarding the dismissal of Mr. Rone from DSP and his subsequent arrest leads me to question the reliability of the work he actually performed in connection with Defendant's trial. Moreover, Defendant has presented no evidence tending to show that the trial testimony given by Mr. Rone was in any way false or misleading."[48]

Hoskins argues that *Fowler v. State* stands for the proposition that a conviction should be set aside when the reliability of key evidence that defendant was the shooter was called into question.[49] Hoskins case is distinguishable from Fowler. *Fowler v. State* (Decided in August of 2018), where the Delaware Supreme Court reversed the Superior Court's judgment denying Fowler postconviction relief, finding that the *Jencks* violations were not harmless error when combined with the credibility issue of the State's ballistic expert (Rone) witness.[50] This was so because Fowler's conviction was based solely on Rone's expert testimony and the only eyewitness to both shootings, whose testimony was called into question by the *Jencks* statements.[51] Here, we have a much different scenario as there were no *Jencks* violations in this case and Carl Rone's expert certifications were not lapsed at the time of the trial. Additionally, Fowler dealt with the first postconviction relief motion for that defendant. This is Hoskins' second postconviction relief motion which requests the exceptions contained in Rule 61(d)(2)

---

[47] *Id*. at *4
[48] *State. v. George*, 2018 WL 4482504, at *3 (Del. Super. Ct. Sept. 17, 2018), dismissing reconsideration, 2019 WL 338669 (Del. Super. Ct. Jan. 4, 2019).
[49] Hoskins Corrected Second Rule 61 Motion at page 28.
[50] *See Fowler v State*, 194 A.3d 16, 27 (Del.2018).
[51] *Id.* at 21-22

be met before any relief can be given. As noted by the State Supreme Court in *Dixon v State*. [52] The fact that Rone' testimony was alleged to be "false and misleading" was not based on "new evidence" but on evidence that had been available to the defense at the time of trial.[53] The burden to show "new evidence" is very high.[54]

Hoskins has presented nothing that was not available to the defense at the time of trial to suggest that Rone's trial testimony regarding ballistics was inaccurate or unreliable. Hoskins complains that Rone, in the 12 years since he testified in Hoskins' case, has pled guilty to falsifying his time sheets. Moreover, that plea involved conduct that post-dated Hoskins' crime by eight years. As this Court has stated, Rone's criminal conduct did not impinge on his work as a toolmark examiner. Indeed, Hoskins has not suggested it has. Hoskins' claim falls far short of "[pleading] with particularity that new evidence exists that creates a strong inference" that he is actually innocent, [55] as Rule 61 requires.

The Delaware Supreme Court has rejected *ad hoc* attacks on the credibility of witnesses when there is no evidence that the witness' credibility directly impacted the case.[56] Likewise, the Supreme Court has rejected the same type of argument requesting an evidentiary hearing in cases where the trial and witness' testimony predated the

---

[52] 2021 WL 3404223 (Del. Aug. 4, 2021)

[53] *Id*. at 4

[54] See, Pernell v State, 2021 WL 2470511 at 36-37 (Del. June 17, 2021)

[55] Super. Ct. Crim. R. 61(d)(2)(i).

[56] *See Ira Brown v. State*, 108 A.3d 1201, 1206 n.30 (del.2015) (holding that the evidence of employee misconduct at the OCME was "impeachment evidence that came to light after Brown pled guilty and was sentenced [and] did not go to his actual innocence or affect the voluntariness of his plea"). *See also Anzara Brown v. State*, 117 a.3d 568,581 (Del. 2015) (defendant not entitled to a new trial where he could no demonstrate that misconduct at the OCME affected his case); *Bunting v. State*, 2015 WL 2147188, at *3 (Del, May 5, 2015) (rejecting defendant's argument that he was entitled to relief based on misconduct at OCME when he failed to allege or offer any proof that the misconduct compromised the integrity of his trial proceedings).

alleged misconduct.[57] For the foregoing reason, I recommended that Hoskins' first claim be denied.

Hoskins next claims that the trial counsel was ineffective for allowing the Court to give an instruction on "intent to kill." Pursuant to Superior Court Criminal Rule 61(d)(2) this claim meets neither requirement for relief. This claim does not concern new evidence as contemplated in 61(d)(2)(i). It also does not claim any new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court pursuant to Rule 61(d)(2)(ii). This claim is also procedurally barred as it could have been raised either on direct appeal or in the defendant's first postconviction relief motion that was filed in January 2012.[58] Additionally, this claim fails on its merits because the trial court's answer to the jury question was firmly grounded in the law. The Superior Court did nothing more than convey that which was codified in the Delaware Criminal Code describing the criminal states of mind.[59] The Court's answer did not require the jury to find an intentional act; rather, it simply elaborated on the statutory definition of "recklessness." There was no constitutional violation here and I recommend this claim be denied.

Finally, Hoskins claims that Rone's testimony was unreliable. This claim mirrors to Hoskins' first claim and as detailed above is meritless. Additionally, this claim must also meet the requirements of Superior Court Criminal Rule 61(d)(2) to avoid summary dismissal. The defendant does not meet either burden in this claim.

Hoskins argues that Rone's Testimony is flawed and the Wentling could prove that point if he were able to "for the first time" review the ballistics evidence in this case. However, Wentling was retained by trial counsel prior to both trials in 2009. As previously noted, Wentling offered an opinion in this case in 2009. Wentling and trial

---

[57] *Cannon v. State*, 127 A.3d 1164, 1168 (Del. 2015).
[58] *Mundy v. State*, 788 A.2d 131 (Del. 2001)
[59] 11 Del.C. §253

counsel were given access to Carl Rone, his entire case file and Mr. Wentling was given use of Rone's laboratory to conduct his own analysis. For chain of custody reason, the analysis had to be done at Rone's laboratory.

After Wentling completed his analysis trial counsel provided the substance of his forensics ballistics opinion by letter to the State on September 11, 2009. There is nothing contained in the 2009 disclosed opinions that suggest unreliability with respect to Rone's opinion. Hoskins chose not to call Wentling at trial.[60]

Now, after reviewing the trial testimony and evidence, Wentling offers another opinion regarding Rone's testimony regarding the ricochet theory. A close review of Wentling's 2020 report reveals that he never reviewed Dr. Tobin's testimony, Carl Rone's testimony during the Motion *in Limine*/Daubert Hearing, Carl Rone's testimony during the State's case in chief, nor did he review his 2009 analysis of the ballistics evidence. I recommend this claim be summarily dismissed.

Finally, Hoskins requests an evidentiary hearing. There is no constitutional right to an evidentiary hearing or to expand the record in a postconviction proceeding.[61] Rather, Rule 61(d)(2) provides that the Court must summarily dismiss a second postconviction motion that has not been sufficiently pled under the Rule.[62] Because Hoskins fails to plead actual innocence and makes no attempt to invoke a new rule of constitutional law, Hoskins is not entitled to an evidentiary hearing.

Furthermore, Hoskins' requested to review the ballistic evidence for a second time. This request is moot. Wentling reviewed the firearms evidence in this case in 2009 and offered his opinion prior to trial. This should be denied. This claim does not concern a new constitutional claim made retroactive by precedent. Defendant cites the

---

[60] See *Dixon v. State*, 2021 WL 3404223, (Del. Aug. 4, 2021), (where evidence available at the time of trial did not satisfy the requirement of Rule 61(d)(2)

[61] *Gattis*, 697 A.2d at 1187-88.

[62] Super. Ct. Crim. R. 61(d)(2).

2009 National Academy of Science report as calling into question Rone's opinion. That report was issued prior to Hoskins' trial. As such it was available to trial counsel and Wentling. In a similar case, the Delaware Supreme Court found:

> Finally, we are not persuaded by Dixon's argument that based largely on the authority of a 2009 National Academy of Science report, the nature of Rone's ballistic analysis was so subjective as to render the new impeachment evidence decisive. Dixon had the opportunity to highlight the subjective nature of toolmark analysis at his trial, which occurred three years after the publication of the NAS report and chose not to do so. We decline to expand the field of our inquiry into areas that Dixon chose not to explore at trial [63]

## CONCLUSION

In reviewing the record in this case, it is clear that Hoskins has failed to avoid the procedural bars of Rule 61(i). Consequently, I recommend that Hoskins' postconviction motion be denied as procedurally time barred by Rule 61(i)(1) and (2) as time barred and as a subsequent motion and as meritless.

/s/Andrea Maybee Freud

Commissioner Andrea Maybee Freud

AMF/jan

---

[63] *Dixon v. State*, 2021 WL 3404223 at 4 (Del. Aug.4, 2021)

31